UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MATTHEW J. NASUTI, on behalf of the United States of America, | ) ) ) | |
| Relator | ) ) | |
| v. | ) ) | Civil Action No. 12-30121-GAO |
| SAVAGE FARMS, INC., A Massachusetts Corporation, JAY SAVAGE, an individual, JOHN G. SAVAGE, JR., an individual, JOSEPH KOSTIUK, JR., an individual, KENNETH S. WILLIAMS, III, an individual, KENNETH S. WILLIAMS, IV, an individual, RICHARD J. BURKE, an individual, LORI CARVER, an individual, HEATHER BAYLIS, an individual, CHRISTINE S. CLARKE, an individual, and RITA THIBODEAU, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO
DEFENDANTS' AND THE UNITED STATES' MOTIONS TO DISMISS
(Document Nos. 63, 66, 70, and 84)
March 7, 2014

NEIMAN, U.S.M.J.

Matthew J. Nasuti ("Relator"), proceeding *pro se*, brings this *qui tam* action under

the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, on behalf of the United States

of America.  He asserts that Savage Farms, Inc., Jay Savage, John G. Savage, Jr.,

Joseph Kostiuk Jr., Kenneth S. Williams, III, Richard J. Burke, Lori Carver, Heather

Baylis, Christine S. Clarke, and Rita Thibodeau (together, "Defendants") either

submitted false claims to the federal government for disaster relief funds in the wake of

Tropical Storm Irene or conspired with applicants to illegally award such funds.  After

the case was unsealed, the United States of America ("Government") declined to

intervene.  *See* 31 U.S.C. § 3730(b)(2).  Thereafter, Defendants and the Government

filed motions to dismiss, which have been referred to this court for a Report and

Recommendation.  *See* 28 U.S.C. § 636(b)(1)(B).  For the following reasons, the court

will recommend that the motions to dismiss be granted.

## I. Background and Procedural History[1]

After Tropical Storm Irene passed through western Massachusetts on August 28,

2011, Congress appropriated disaster relief funds to the United States Department of

Agriculture ("USDA")'s Massachusetts Office pursuant to the Emergency Conservation

Program ("ECP"), 16 U.S.C. § 2201 *et seq*., and the Environmental Quality Incentives

Program ("EQIP"), 16 U.S.C. § 3839aa *et seq.*  (Second Amended Complaint ("Compl.")

¶ 19.)  Fifty-nine percent of the ECP and EQIP funds appropriated to Massachusetts

were paid to "two wealthy farms," Savage Farms, Inc. and the Williams Farm.  (Id.)

John G. Savage is the owner and President of Savage Farms, Inc., Jay Savage is its

---

[1] The following allegations come from Relator's Second Amended Complaint (Document No. 158-1), for which leave to file was granted on February 14, 2014.  (See Electronic Order No. 131.)  The court notes that Relator also "lodged" with the court additional iterations of his complaint, both entitled "Second Amended Complaint" (Document Nos. 93 and 117), while his motion for leave to file his initial Second Amended Complaint was still pending.  This court thereafter granted him leave to file the initial Second Amended Complaint only, not the additional "lodged" complaints for which he did not seek leave. (See Document No. 158.)  Relator has appealed that ruling.  For purposes of the following factual recitation, however, the differences between the properly filed Second Amended Complaint and the two other "lodged" complaints are insubstantial; each contains the same core set of facts, albeit somewhat expanded in the "lodged" complaints.  The court also notes that the Savage Defendants and the USDA Defendants assert in their motions to dismiss that their arguments apply equally to Relator's proposed Second Amended Complaint, for which leave to file had yet been granted.

Treasurer and Secretary, and Joseph Kostiuk, Jr., owns farmland on which it operates. (Id. ¶ 4-6.)  Kenneth S. "Sandy" Williams, III, co-owns and operates along with his son Kenneth S. "Chip" Williams, IV, the Williams Farm.  (Id. ¶ 7-8.)  The court will refer to these two sets of defendants as "Farm Defendants."  Relator alleges that, "[t]hrough false and misleading statements, certifications and omissions," the Farm Defendants "stole [ECP and EQIP] funds intended for struggling small, beginner and minority farmers."  (Id. ¶ 1.)

In particular, Relator alleges the following "fraud schemes" perpetrated by the Farm Defendants.  In September of 2011, Jay Savage wrote to USDA and vastly overstated the degree of damage to the farm and the amount of monetary losses caused by the storm.  (Id. ¶ 25-26.)  Also in September of 2011, Chip Williams falsely stated to Congressman John Olver that, if the Williams Farm were not to receive any money, they "probably can't farm any more."  (Id. ¶ 27.)  In or around February of 2012, the Farm Defendants submitted to USDA inflated invoices which falsely certified the "actual" costs of storm-related work on the farms.  (Id. ¶ 30.)  The Farm Defendants also submitted information to USDA, in or around February of 2012, falsely stating that their land values were $11,600 per acre, whereas "[t]he actual value per acre, based on Town of Deerfield Assessor record, is less than $3,000 an acre."  (Id. ¶ 33.)  Had the Farm Defendants used the correct per-acre values, Relator asserts, the Farm Defendants would have received smaller grants.  (Id.)

Relator's complaint continues: in or around March of 2012, the Farm Defendants submitted to USDA "Request for ECP Funding" forms that were backdated to August 31, 2011, in order to conceal the fact that they began cleanup work prior to submitting

3

the forms.  (Id. ¶ 28.)  If the Farm Defendants had not backdated the forms, Relator

asserts, they would have been ineligible for the funds.  (Id.)  Also in or around March of

2012, the Farm Defendants submitted forms to USDA falsely stating that the cleanup

work could not be performed without federal cost-sharing.  (Id. ¶ 29.)  Relator asserts

that the Farm Defendants in fact did have the resources to remediate their farms without

requiring USDA assistance.  (Id.)   Sandy and Chip Williams also submitted to USDA, in

or around March of 2012, separate invoices so as to improperly evade the $200,000

ceiling for ECP funds.  (Id. ¶ 31.)  In addition, Jay Savage and Jospeh Kostiuk

submitted forms to USDA, in or around March of 2012, falsely certifying that they had

not received and would not be receiving any other USDA funding for the farm.  (Id. ¶

34.)

In relation to the EQIP funding, Relator continues, Jay Savage submitted to

USDA, on approximately March 28, 2012, an invoice falsely stating a land value of

$10,000 per acre.  (Id. ¶ 37.)  Moreover, Jay Savage and Joseph Kostiuk submitted

requests for waiver under EQIP to USDA in which they falsely stated that they had not

yet begun work and that the work was included in their Natural Resources Conservation

Service "approved program and has been deemed needed an feasible."  (Id. ¶ 38.)

Lastly, Relator alleges that the Savage Defendants used the ECP and EQIP funds for

"illegal purposes," *i.e.*, "to damage the environment" by bulldozing "thousands of tons of

river sediments into a Commonwealth of Massachusetts protected buffer zone

bordering the Deerfield River in order to create levees to prevent future flooding of their

properties."  (Id. ¶ 20.)

Relator also alleges the following fraud schemes perpetrated by Richard J. Burke, Lori A. Carver, Heather Baylis, Christine S. Clarke and Rita Thibodeau ("USDA Defendants"), all of whom are or were employed by the USDA.  Burke, Carver and Baylis served on the Franklin County Farm Service Agency Committee, which on March 18, 2012 approved the ECP payments to the Farm Defendants "despite numerous indicators of fraud, including that the Williams Defendants were receiving $400,000.00 for work on the same farm."  (Id. ¶ 39-41.)  They "also knew that essentially two farms were receiving a disproportionate amount of the total ECP aid to Massachusetts (which is suspicious)."  (Id.)  Moreover, Relator asserts, Burke, Carver and Baylis "knew about one or more of the false statements by the Farm Defendants," including "that the Farm Defendants did not need USDA money as they completed or substantially completed all their Tropical Storm Irene response work prior to receiving any USDA money [and] therefore they were ineligible for such funds."  (Id.)

Relator alleges as well that Clarke and Thibdoeau visited the two farms and knew that the Farm Defendants "had initiated site cleanup work immediately after the passage of Tropical Storm Irene and therefore were not eligible for either ECP or EQIP grants."  (Id. ¶¶ 42, 43.)  Clarke also approved EQIP waivers even though she knew that the applications contained false statements.  (Id.)  Thibodeau "knew that the Savage and Kostiuk Defendants received both ECP and EQIP funding, which was illegal" and "was aware of the Savage's levee construction project and she actively attempted to mislead Relator and the Town of Deerfield regarding it."  (Id. ¶ 43.)  In addition, Relator alleges,

"Thibodeau knew that one or more of the ECP applications . . . were illegally backdated to August 31, 2011."  (Id.)[2]

Relator initiated this action on July 10, 2012, by filing a complaint, on behalf of the United States of America, against the Farm Defendants.  (Document No. 1.)  In accordance with 31 U.S.C. § 3730(b)(2), Relator also filed on July 10, 2012, a motion to seal, which motion was granted.  (Document No. 2.)  On September 5, 2012, the Government filed a motion for an extension of time to notify the court of its decision as to whether or not to intervene in the case.  (Document No. 8.)  In support of its motion, the Government asserted that it had begun its investigation but that it needed additional time "to investigate Relator's allegations further," which would "permit the United States to make an informed judgment as to whether or not to intervene in this case." (Document No. 9.)  Five days later, on September 10, 2012, Relator filed an amended complaint, in which he named the USDA Defendants.  (Document No. 10.)  On September 13, 2012, District Judge Michael A. Ponsor, to whom the case had been assigned, granted the Government's motion for an extension of time and ordered that the matter remain under seal.  (Document No. 13.)

On November 19, 2012, the Government filed a notice of election to decline intervention, in which it noted that Relator was not represented by counsel and that "a *pro se* litigant is ordinarily not permitted to represent the interests of the United States in a *qui tam* lawsuit."  (Id.)  The Government further noted that "it appears [Relator] is not

---

[2] Relator also makes various allegations of nepotism in the USDA's Massachusetts Office.  For example, he alleges that Thibodeau assisted her husband, Kenneth Herzig, in falsifying his ECP application for the West Branch Farm, which Herzig owns.  (Id.)

licensed to practice law; if this is the case, unless Relator secures representation by counsel, the lawsuit should be dismissed." (Id.) The Government also requested that Relator's complaint and any amended complaints be unsealed. (Id.) In response to the Government's notice, Judge Ponsor entered an order on December 4, 2012, unsealing the complaint and any amendments thereto as well as any future filings in the case. (Document No. 18.) The order also required Relator to notify the court, within thirty days, "that he has retained counsel to represent him in this matter, or to show cause why, if he has not retained counsel, this action should not be dismissed." (Id.) On December 18, 2012, Relator filed a Response to the Court's December 4, 2012 Order and Motion in the Alternative for Court-appointed Counsel. (Document No. 20.) Among other things, Relator explained that he is an experienced attorney admitted to practice in New York, argued that the cases cited by the Government for the proposition that a *pro se* litigant may not bring a *qui tam* action are "bad law" and not applicable to this case because "[t]hey expressly limit their holdings to non-attorney relators," and requested, in the alternative, that the court appoint counsel "if it deems that additional counsel is necessary." (Id.)

On May 9, 2013, Relator filed a motion for leave to file a second amended complaint. (Document No. 56.) On May 29, 2013, Joseph Kostiuk, Jr., Sandy Williams, and Chip Williams filed a motion to dismiss on the grounds that Relator cannot proceed *pro se* and that the action is prohibited by the "public disclosure bar" under 31 U.S.C. § 3730(e)(4). The next day, Savage Farms, Inc., Jay Savage, and John G. Savage, Jr. filed their own motion to dismiss. In addition to the grounds asserted in the May 29th motion, the Savage Defendants argued that the case should be dismissed because

Relator failed to allege fraud with sufficient particularity pursuant to Fed.R.Civ.P. 9(b)

and violated the court's seal order by publishing an article which revealed certain facts

about the case.  On May 31, 2013, the Government itself filed a motion to dismiss under

31 U.S.C. § 3730(c)(2)(A), which statute, the Government asserts, grants it the

"unfettered discretion" to dismiss *qui tam* actions.  On July 15, 2013, the USDA

Defendants, who had retained private counsel, filed a motion to dismiss.[3]  In addition to

the arguments asserted by the other defendants and the Government, the USDA

Defendants argued that they are immune from suit and that the claims against three of

them -- Burke, Clarke and Carver -- should be dismissed for insufficient service of

process.[4]

On September 13, 2013, due to Judge Ponsor's taking senior status, the case

was reassigned to District Judge George A. O'Toole, Jr.  (Electronic Notice No. 102.)

On December 3, 2013, Judge O'Toole referred all of the outstanding motions to this

court for consideration.  (Electronic Order No. 126.)  On February 14, 2014, this court

entered orders on all of the motions except the four motions to dismiss.  (Electronic

---

[3] Attached to the memorandum in support of the motion to dismiss is a letter from Deputy Assistant Attorney General Brian Hauck stating that "[a]fter careful review and consideration of the information presently available, it reasonably appears that, at the pertinent times, [the USDA Defendants] acted within the scope of their federal employment, and that representation in connection with the above matter is in the interest of the United States."  (Exhibit 1 (attached to USDA Defendants' Memorandum in Support of Motion to Dismiss).)  Hauck continued:  "It also appears however, that their representation by attorneys employed by the Department of Justice is inappropriate."  (Id.)  He therefore authorized the retention of private counsel at Government expense pursuant to 28 C.F.R. §§ 50.15 and 50.16.  (Id.)

[4] The court subsequently indicated that it would assume that the USDA Defendants had been properly served and it does so now.  (*See* Electronic Order No. 134.)

Orders Nos. 131-140, 142, 144-148.)   As relevant here, the court, as described,

granted Relator's motion for leave to file the second amended complaint.  (Electronic

Order No. 131.)[5]  On February 27, 2014, the court held a hearing on the motions to

dismiss.

II. DISCUSSION

A.  False Claims Act *Qui Tam* Provisions

"The FCA allows private persons, called relators, to bring qui tam actions on

behalf of the United States against persons or entities who knowingly submit false

claims to the federal government."  *United States ex rel. Ondis v. City of Woonsocket*,

587 F.3d 49, 53 (1st Cir. 2009) (citing 31 U.S.C. § 3730(b)(1)).  Under this unique

statutory scheme, the relator files a complaint under seal and serves it, along with a

statement of evidence, on the Government.  31 U.S.C. § 3730(b)(2).  While the

complaint remains under seal, the Government has at least sixty days to investigate the

allegations and to elect whether or not to intervene in the action.  *Id.*  If the Government

elects to intervene, it assumes "primary responsibility for prosecuting the action" and is

not bound by the acts of the relator, who still has "the right to continue as a party to the

action."  *Id.* § 3730(c)(1).  If the Government opts not to intervene, the relator "shall

have the right to conduct the action."  *Id.* § 3730(b)(4)(B)  "Either way, the relator is

eligible to collect a portion of any damages awarded."  *Onidis*, 587 F.3d at 53 (citing 31

U.S.C. § 3730(d)).

---

[5]The court notes that Relator has appealed many of this court's rulings to Judge
O'Toole.  (See Document Nos. 152 and 158.)

As the Supreme Court made clear in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), although relators have standing as "partial assignees" of the Government's damages claim, they bring suit, in the name of the Government, to redress injuries in fact *suffered by the Government*, and not their own injuries. *Id.* at 772-74. "[T]he Government," therefore, "remains the real party in interest in any such action." *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d. Cir. 2008) (quoting marks omitted); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 n.10 (5th Cir. 2001) (collecting cases). Accordingly, even when the Government initially declines to intervene, it retains significant control over the litigation and, thus, the relator's "right to conduct the action" is circumscribed. For example, "[t]he Government may settle the action with the defendant notwithstanding the objections of [the relator] if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.* § 3730(c)(2)(B). Moreover, the relator may not dismiss the action unless "the court and the Attorney General give written consent." *Id.* § 3730(b)(1). The Government may also "intervene at a later date upon a showing of good cause." *Id.* § 3730(c)(3). And, most importantly for purposes here, "[t]he Government may dismiss the action notwithstanding the objections of the person initiating the action if [the relator] has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." *Id.* § 3730(c)(2)(A).

B.  *Pro Se* Relator's Ability to Conduct the Action

Despite the Government's motion for dismissal, which if allowed would terminate the case for all concerned, the court has deemed it appropriate to consider as an initial

matter whether Relator even has the representative capacity to pursue this action in light of his *pro se* status.  As mentioned, Defendants contend that he does not.  They argue that, because relators bring suit on behalf of the Government and *pro se* litigants may only represent themselves, a relator may not proceed *pro se*.  Relator counters that Defendants lack standing to raise this issue, that relators represent their own interests in *qui tam* actions, and that he is permitted to proceed *pro se* under Local Rule 83.5.3(a) as an "attorney for the United States."  The court finds Defendants' arguments far more persuasive.[6]

Since November 19, 2012, when the Government filed its notice declining to intervene in this action, Relator has been aware of the issue of his capacity to sue. Relator no doubt has been aware as well of his opportunity, as an attorney admitted in another jurisdiction, to seek admission to this court *pro hac vice*.  *See* Local Rule 83.5.3(b).  (Of course, an attorney admitted to practice in this court would first have to file an appearance and move for Relator's admission *pro hac vice*, among other requirements.  *Id*.)  Relator, however, apparently made no efforts in this regard.

_____

[6] The court recognizes that the "public disclosure bar," which Defendants raise, also represents a potential jurisdictional infirmity and that, as a general matter, federal courts should decide subject matter jurisdiction questions as a threshold issue.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  The court, however, believes that both the *pro se* issue and dismissal under § 3730(c)(2)(A) represent the type of "non-merits, nonjurisdictional" rules of dismissal which may precede resolution of subject matter jurisdiction questions.  *Public Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1347-48 (D.C. Cir. 2007 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)); *see also United States ex rel. Wickliffe v. EMC Corp.*, 473 Fed.Appx 849, 852 & n.5 (10th Cir. 2012) (unpublished) (declining to address the "public disclosure bar" and other subject matter jurisdiction issues and instead addressing § 3730(c)(2)(A), because "[d]ismissal under § 3730(c)(2)(A) avoids a decision on the merits . . . and 'does not entail any assumption by the court of substantive law-declaring power.'" (citations omitted)).

Accordingly, despite Relator's representation that he is admitted to the New York state bar and has extensive litigation experience, which representations the court accepts for present purposes, the court is compelled to view him, for purposes of practicing in this court, no differently than any other *pro se* litigant.  *See Nationalist Movement v. City of Boston*, 1999 WL 700497, at *1 (1st Cir. Sept. 2, 1999) (unpublished).

To be sure, Relator argued at the hearing on the instant motions that Judge Ponsor, by requiring Relator to show cause why the action should not be dismissed in light of his *pro se* status and thereafter not dismissing the action following Relator's Response, implicitly ruled that he *may* proceed *pro se*.  This court is not convinced. First, Judge Ponsor never implicitly or explicitly ruled on the issue.  Second, within several months of Relator's response to Judge Ponsor's show-cause order, Defendants raised the capacity issue in their motions to dismiss.  In the court's view, therefore, the issue is still live and ripe for adjudication.

The court also rejects Relator's argument that Defendants lack standing to raise this issue.  In short, Relator provides no support for this assertion, and the court cannot find any.  *See, e.g.*, *United States ex rel. Mergent Servs. v. Flaherty*, 2006 WL 880044, at *1 (S.D.N.Y. April 6, 2006) (granting *the defendant's* motion to dismiss on the ground that the relator may not proceed *pro se*), *aff'd*, 540 F.3d 89 (2d Cir. 2008); *see also Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1120, 1126-28 (9th Cir. 2007) (affirming the district court's *sua sponte* holding that the relator could not proceed *pro se*).

As to the capacity issue itself, there is nearly universal support for the principle that a *pro se* litigant may not pursue a *qui tam* action.  In fact, every circuit that has

12

addressed the issue is in agreement.  *See Mergent Servs.*, 540 at 93; *Timson v. Sampson*, 518 F.3d 870, 873-74 (11th Cir. 2008); *Stoner*, 502 at 1126-27; *United States ex rel. Lu v. Ou*, 368 F.3d 773, 775-76 (7th Cir. 2004), *rev'd on other grounds*, 556 U.S. 928 (2008); *United States ex rel. v. Lockheed Martin Corp.*, 237 Fed.Appx. 802, 802 (4th Cir. 2007) (unpublished).  And while the First Circuit has yet to address the issue, the one court in this district which has also agrees.  *See United States ex rel. Barlow v. Bristol-Meyers Squibb Co.,* 2010 WL 3824108 (D.Mass. Sept. 27, 2010).  These decisions uniformly rely, at least in part, on the proposition that *pro se* individuals may only litigate on their own behalf and not on behalf of the Government, as is required in *qui tam* actions.

The Ninth Circuit's decision in *Stoner* is particularly on point, most importantly because it involved an attorney-relator seeking to proceed *pro se*.  The *Stoner* relator, as here, was an attorney who was not admitted to practice before the district court and did not seek *pro hac vice* admission.  *Stoner*, 502 f.3d at 1125-26 (relator-attorney "sought to proceed *pro se*").  Thus, contrary to Relator's assertion in his December 18, 2012 Response, the cases cited in the Government's November 19, 2012 Notice, one of which was *Stoner*, did not "expressly limit their holdings to non-attorney relators."

The Ninth Circuit first addressed the general *pro se* statute, 28 U.S.C. § 1654, and stated that it gave the relator the right to prosecute his own actions, but it did not permit him "to prosecute an action in federal court on behalf of others than himself."  *Id.* at 1126.  The Ninth Circuit next explained that while the "partial assignment" discussed by the Supreme Court in *Stevens* provided the relator standing, "it does not," contrary to Relator's present argument, "transform a *qui tam* action into the relator's 'own case' for

13

purposes of § 1654."  Rather, the Ninth Circuit explained, "the underlying claim of fraud always belongs to the government" and a relator "is representing the interests of the government and prosecuting the action on its behalf."  *Id.*  The Ninth Circuit also noted that the Government "'is bound by the relator's actions' for purposes of res judicata and collateral estoppel."  *Id.* (quoting *United States v. Schimmels*, 127 F.3d 875, 884 (9th Cir. 1997)).  Finally, the Ninth Circuit explained, the FCA itself does not authorize relators to proceed *pro se* and, thus, Congress "must have had in mind that such a suit would be carried on in accordance with the established procedure which requires that only one licensed to practice law may conduct proceedings in court for anyone other than himself."  *Id.* at 1127 (quoting *United States v. Onan*, 190 f.2d 1, 6 (8th Cir. 1951)).  The court finds this analysis persuasive.

As to Relator's last argument, the court is not convinced that, by bringing this action, he has become an "attorney for the United States" for purposes of Local Rule 83.5.3(a).[7]  While, as discussed, a relator prosecutes a *qui tam* action *on behalf of the United States*, he or she does not become "the attorney for the United States," as contemplated by the Local Rule.  *See Lu*  368 F.3d at 775 ("The relator is not technically the government's lawyer . . . ."); *see also United States ex rel. Phillips v. Pediatric Servs. of America*, 123 F.Supp.2d 990, 994 (W.D.N.C. 2000) ("The *qui tam* provision of

---

[7] Local Rule 83.5.3(a) provides:
An attorney in good standing as a member of the bar in every jurisdiction where he or she has been admitted to practice and not subject to pending disciplinary proceedings as a member of the bar of any United States District Court may appear and practice in this court as the attorney for the United States or any agency of the United States or an officer of the United States in his official capacity, or as an attorney employer in the Federal Defender's Office for this District.

the FCA does not vest relators with governmental authority and, therefore, they are not Article II 'officers.'").  Moreover, Relator's approach would fly in the face of the FCA statutory scheme, which sets forth roles for both the relator and the Government.  It would also conflict with the obvious purpose of Local Rule 83.5.3(a), which is to allow attorneys employed by the federal government to appear and practice in this district.  Accordingly, Christine Wichers, who entered an appearance "as counsel for the United States" (Document No. 122), is the "attorney for the United States" in this action, not Relator.  *See United States by Dep't of Defense v. CACI Inter'l Inc.*, 953 F.Supp. 74, 77 (S.D.N.Y. 1995) ("While the *quit tam* relator is empowered as a private prosecutor, it is not empowered to replace the government.").

In sum, because Relator "is not a member of the bar of this court," is not "the attorney for the United States" under Local Rule 83.5.3(a), and has not sought or received *pro hac vice* admission under Local Rule 83.5.3(b), he may "appear and practice before the court *only* in his own behalf."  Local Rule 83.5.3(c) (emphasis added); *see also Barlow*, at *1.  Therefore, this court concludes that Relator may not prosecute this *qui tam* action, which necessarily asserts claims on behalf of the Government, and recommends dismissal of the action on this ground alone.

B.  Dismissal Under 31 U.S.C. § 3730(c)(2)(A)

Despite the recommendation above, the court will address the Government's argument for dismissal pursuant to 31 U.S.C. § 3730(c)(2)(A).  The Government principally argues, relying on *Swift v. United States*, 318 F.3d 250 (D.C.Cir. 2003), and its progeny, that it has "an unfettered right to dismiss" a *qui tam* action absent something akin to "fraud on the court," which is not present here.  The Government

argues in the alternative that, even under the somewhat less expansive test established by the Ninth Circuit in *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998), dismissal is similarly warranted because it is rationally related to the Government's legitimate interest in avoiding expenditure of scarce resources on a case that it believes to be meritless.  Relatedly, the Government argues, Relator has not carried his burden under the *Sequoia Orange Co.* test to show that dismissal is "fraudulent, arbitrary and capricious, or illegal."

In response, Relator argues that, because the Government declined to intervene, it lacks standing to seek dismissal and, relatedly, it may not rely on section 3730(c)(2)(A) unless it first moves to intervene for "good cause" under section 3730(c)(3).  Relator also argues that *Swift* is "bad law" and inapplicable to this case, that dismissal is not appropriate under either *Swift* or *Sequoia Orange Co.* because the Government has misled the court about its investigation into the merits of his allegations and its reasons for seeking dismissal, and that the Government has a higher burden for seeking dismissal here because this is a "public corruption" case.

As an initial matter, the court concludes, contrary to Relator's assertion, that, despite not intervening in the action, the Government clearly has standing and is entitled to seek dismissal under section 3730(c)(2)(A).  As discussed, even if the Government does not intervene in a FCA *qui tam* action, it retains significant control over the litigation and is still considered the "real party in interest."  Indeed, interpreting the FCA in a manner that limits the role of the Government in such actions, as Relator urges the court to do, could raise serious constitutional concerns.  *See Ridenour v. Kaiser-Hill Company, L.L.C.*, 397 F.3d 925, 934 (10th Cir. 2005) (surveying cases that

16

uphold the constitutionality of the FCA under Article II's Take Care Clause in light of the
Government's significant control over *qui tam* actions and concluding "that to condition
the Government's right to move to dismiss an action in which it did not initially intervene
upon a requirement of late intervention tied to a showing of good cause would place the
FCA on constitutionally unsteady ground"); *see also Riley*, 252 at 753 (upholding the
constitutionality of the FCA under Article II's Take Care Clause, in part, because "even
in cases where the government does not intervene, there are a number of control
mechanisms present in the qui tam provisions of the FCA so that the Executive
nonetheless retains a significant amount of control over the litigation," including the
government's "unilateral power to dismiss an action 'notwithstanding the objections'" of
the relator pursuant to section 3730(c)(2)(A)).

Not only would Relator's interpretation place the FCA "on constitutionally
unsteady ground," it also conflicts with the plain language of the statute.  As the Tenth
Circuit explained, there is "nothing in the language of § 3730(c)(2)(A) to suggest the
authority of the Government to dismiss a *qui tam* action is dependent upon prior
intervention in the case."  *Ridenour*, 397 F.3d at 933.  In addition, as the D.C. Circuit
explained, section 3730(b)(2) -- which states that "[t]he Government may elect to
intervene and proceed with the action" -- "makes intervention necessary only if the
government wishes to 'proceed with the action.'  Ending the case by dismissing it is not
proceeding with the action; to 'proceed with the action' means, in the False Claims Act,
that the case will go forward with the government running the litigation."  *Swift*, 218 F.3d
at 251; *see also Ridenour*, 397 F.3d at 933 (legislative history "clearly suggests the
purpose of late intervention is to pursue litigation, not dismiss it").  Accordingly, the court

17

agrees with every circuit that has addressed this issue that intervention is not necessary before the Government may seek dismissal under section 3730(c)(2)(A).  *See Ridenour*, 397 F.3d at 934-35; *Swift* 218 F.3d at 251-252; *Sequoia Orange Co.*, 151 F.3d at 1145.[8]

Neither the First Circuit nor, apparently, any district court in this circuit has yet addressed the proper standard for determining whether to grant a motion to dismiss under section 3730(c)(2)(A).  Accordingly, the court will briefly discuss the two competing approaches before making its recommendation.  In *Sequoia Orange Co.*, the Ninth Circuit adopted the following standard formulated by the district court for testing whether dismissal by the Government is appropriate:  "(1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose."  *Sequoia Orange Co.*, 151 F.3d at 1145 (quotation marks omitted).  If the Government satisfies this initial inquiry, "the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal."  *Id.* (quotation marks omitted).

Five years later, the D.C. Circuit, in *Swift*, rejected the *Sequoia Orange Co.* standard.  *Swift*, 218 F.3d at 252-53.  Concluding that the Government has "an unfettered right to dismiss" FCA *qui tam* actions, the D.C. Circuit cited the language of section 3730(c)(2)(A), which states that "[t]he Government may dismiss the action," as well as "the presumption that decisions not to prosecute . . . are unreviewable."  *Id.*  The

---

[8] As the D.C. Circuit also explained, even if the Government were required to intervene before seeking dismissal, the court "could construe the government's motion to dismiss as including a motion to intervene."  *Swift*, 218 F.3d at 252.  Under such an approach, the court would conclude here that the Government has "good cause" for seeking intervention under section 3730(c)(3) in light of its reasons for seeking dismissal.

D.C. Circuit further explained that the purpose of the hearing required by section 3730(c)(2)(A) "is simply to give the relator a formal opportunity to convince the government not to end the case," but did leave open the possibility that an exception for "fraud on the court" might exist. *Id.* at 253; *see also Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 65 (D.C.Cir. 2008) (holding that "any exception to section 3730(c)(2)(A) – if there are any – must be like 'fraud on the court' and [the relator's] proposed 'manifest public interest' exception is not"). The only other circuit to weigh in on the controversy, the Tenth Circuit, has sided with the Ninth Circuit. *See Ridenour*, 397 F.3d at 396.[9]

The court is persuaded that the *Sequoia Orange Co.* standard adopted by the Ninth and Tenth Circuits is the better of the two. As Relator argues, it would be superfluous for Congress to require a hearing in front of a court before a *qui tam* action may be dismissed under section 3730(c)(2)(A) if the court's only role were to sit idly by as the relator attempts to persuade the Government not to dismiss the action. Such an "opportunity to convince the government not to end the case" could easily take place

---

[9] Relator makes much of the fact that *Swift* was a "pre-service" case, in that the government sought dismissal while the action was still under seal and before the defendants were served. While the D.C. Circuit in *Swift* explained that its standard was also consistent with Fed.R.Civ.P. 41(a)(1)(i), which permits a plaintiff to dismiss a civil action "without order of the court" if the defendant has not yet filed an answer or a motion for summary judgment, it has since applied *Swift*'s holding to a post-service case. *See Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 65 (D.C.Cir. 2008); *see also United States ex rel. Wickliffe v. EMC Corp.*, 473 Fed.Appx 849, 853 (10th Cir. 2012) (unpublished). Moreover, to the extent Rule 41(a)(1)(i) provides any guidance, Defendants, although having been served, have not filed answers. *See, e.g., Aamot v. Kassel*, 1 F.3d 441, 443 (6th Cir. 1993) (recognizing that a motion to dismiss is not considered an answer for purposes of Rule 41(a)(1)(i)). Accordingly, contrary to Relator's assertions, *Swift* and its progeny are not factually distinguishable. Nor, contrary to Relator's argument, has *Swift* been "decisively rejected" by the D.C. Circuit. The case cited by Relator for this proposition, *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228 (D.C.Cir. 2012), addresses settlements under § 3730(c)(2)(B). If anything, *Schweizer* reaffirmed *Swift*'s holding. *See id.* at 1233, 1235-36.

outside of the courtroom.  In addition, section 3730(c)(2)(A) speaks in terms of the

Government filing a "motion," which normally entails some judicial review.

That is not to say, however, that the Government's quest to dismiss an action

under the *Sequoia Orange Co.* standard should be particularly arduous.  As discussed,

limiting the Government's role in any significant way in *qui tam* actions, including its

ability to accomplish dismissal under section 3730(c)(2)(A), could bring the

constitutionality of the FCA into question.  After all, a *qui tam* action is brought in the

Government's name and, as the real party in interest, it should have broad discretion to

determine its fate.  It is for that reason that the courts which have adopted the *Sequoia*

*Orange Co.* test have indicated that it is a fairly easy standard for the Government to

satisfy.  For example, the Tenth Circuit explained that "to establish a rational relation to

a valid governmental purposes, '[t]here need not be a tight fitting relationship between

the two; it is enough that there are plausible, or arguable, reasons supporting the

agency decision.'"  *Ridenour*, 397 F.3d at 937 (quoting *United States ex rel. Sequoia*

*Orange Co. v. Sunland Packing House Co.*, 912 F.Supp. 1325, 1341 (E.D.Ca. 1995)).

The Ninth Circuit similarly explained that the requirements of section 3730(c)(2)(A)

should not "pose significant barriers to the Executive Branch's exercise of its

prosecutorial authority."  *Sequoia Orange Co.*, 151 F.3d at 1146 (quoting *United States*

*ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 756 (9th Cir. 1993)).

Here, the Government asserts that the United States Attorney's Office, in

conjunction with the USDA Office of the Inspector General, "investigated each of

[Relator's] allegations and found that [his] allegations were either factually incorrect or

without foundation."  (United States' Memorandum in Support of Motion to Dismiss at 4.)

As examples, the Government explains, its investigation revealed that the applications which Relator alleges to have been backdated were received on the date listed therein, that the Farm Defendants in fact were eligible for the funds, and that USDA representatives visited the sites and found that the work was within the scope of USDA regulations.  The Government also asserts that, were this case to continue, it would incur substantial costs in monitoring the litigation, *see* 31 U.S.C. § 3730(c)(3) ("If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense)," responding to discovery requests, and clarifying Relator's misstatements of the law.  Moreover, the Government asserts, because Relator also sued federal government employees, who have been deemed to have been acting in the scope of their employment, it will need to bear the expense of paying for their outside counsel.  For these reasons, the Government maintains, it wishes to dismiss the action.

The court concludes that the Government has satisfied its burden for dismissal.  As the Ninth Circuit explained, litigation costs represent a valid governmental interest.  *See Sequoia Orange Co.*, 151 F.3d at 1146 (holding that the district court "properly noted that the government can legitimately consider the burden imposed on the taxpayers by its litigation, and that, even if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs"); *see also Swift*, 318 F.3d at 254 (holding, in the alternative, that "the government's goal of minimizing its expenses is still a legitimate objective, and dismissal of the suit furthered that objective"); *United States ex rel. Piacentile v. Amgen Inc.*, 2013 WL 5460640, at *4 (E.D.N.Y. Sept. 20, 2013).  This is especially true in a case like this, the court finds,

where the Government contends that Relator's claims lack merit.  In contrast, the Government conceded in both *Sequoia Orange Co.* and *Ridenour*, that the claims therein *did* have merit, yet it still succeeded in dismissing those actions.  *See Ridenour*, 397 F.3d at 930; *Sequoia Orange Co.*, 151 F.3d at 1143; *see also Wickliffe*, 473 Fed.Appx. at 854 ("[T]he potential merit of a qui tam action is insufficient to overcome the government's rational reasons for dismissing the suit.").

The court also concludes that Relator has not demonstrated that dismissal would be "fraudulent, arbitrary and capricious, or illegal."  Granted, Relator asserts that, because the Government has not provided a "report" of its investigation, no such investigation ever occurred.  He also asserts that the timing of the Government's motion suggests a pretextual motivation.  And, according to Relator, the Government initially gave him the "green light" to pursue the action by declining to intervene and, therefore, indicated that it deemed his allegations to be meritorious.  Finally, Relator points to his nepotism allegations and asserts that the Government is attempting to perpetrate a cover-up in favor of politically-connected farmers.  The court is not persuaded.

The court first notes that Relator appears to misconstrue the relative burdens under the *Sequoia Orange Co.* test.  The Government need not produce evidence in support of its reasons for seeking dismissal.  Rather, it need only provide "plausible, or arguable, reasons supporting" its decision, *Ridenour*, 397 F.3d at 937, whereupon it becomes the relator's burden to come forward with some evidence to rebut the Government's asserted reasons and demonstrate that the decision is "fraudulent, arbitrary and capricious, or illegal."  *See id.* at 938 ("[T]here was no evidence that either the [Department of Energy] or any of its contractors prevailed upon the Justice

22

Department to dismiss the action for improper purposes.  In fact, there was no evidence the Department of Justice exercised anything other than its independent judgment in deciding to dismiss the case"); *Swift*, 318 F.3d at 254 ("While [the relator] asserted that the government's reasons for dismissal were pretextual, she offered nothing to support the charge.").  After all, courts must presume that "the Executive is acting rationally and in good faith" in exercising its prosecutorial discretion.  *Swift*, 318 F.3d at 253 (citing *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996), and *Rinaldi v. United States*, 434 U.S. 22, 30 (1977)); *see also Ridenour*, 397 F.3d at 939 ("When a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its stated reasons." (quotation marks omitted)).

Here, there is no support for Relator's assertion that the Government failed to investigate his allegations.  As the Government explained at the hearing, there is no official "report" of its investigation, only an internal memorandum which the Government contends is privileged.  As to Relator's "green light" argument, the court agrees with the Government that "it is inappropriate to draw any inference as to the merit or lack of merit in a relator's allegations based on the fact that the United States has declined intervention, '[b]ecause the government may have a host of reasons for not pursuing a claim.'"  (United States' Memorandum in Support of Motion to Dismiss at 10 n.2 (quoting *United States ex rel Feldman v. Van Gorp*, 2010 WL 2911606, at *2 (July 8, 2010)).)  Moreover, the Government's delay in seeking dismissal – less than six months from the time the case was unsealed – was not at all protracted, especially when compared to other cases.  *See Ridenour*, 397 F.3d at 929-30 (the government sought and obtained dismissal three years after the action commenced); *Piacentile*, 2013 WL 5460640, at *1-

3 (nine years after initial action commenced and after the government agreed to a $780,000,000 settlement, the government sought and obtained dismissal). There is also no support for Relator's assertion that nepotism or political connections played any role in the Government's decision to seek dismissal. In the end, Relator's assertions amount to little more than unsupported speculation insufficient to prevent dismissal. *See Wickliffe*, 473 F.ed Appx. at 854 ("Such speculation, without more, is insufficient to demonstrate the government is engaging in fraudulent, illegal, or arbitrary and capricious action.").[10]

Continuing, the court finds no "higher burden" exception for dismissing "public corruption" cases, as Relator posits. Indeed, Relator provides no support for this assertion other than broad statements regarding public policy. If anything, the D.C. Circuit in *Swift* -- a case very much like this one involving federal government defendants -- provided no indication that a different approach might be required under the *Sequoia Orange Co.* standard. *Swift*, 318 F.3d at 251-52. Of course, Congress, which "is the final authority as to desirable public policy," *Bd. of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374 (2001), could have established a different scheme for such cases, but it has not.

To be sure, Relator also argued at the hearing on February 27, 2014, that he is entitled to an evidentiary hearing. The court does not agree. As the Government argued, section 3730(c)(2)(A) does not specify that an *evidentiary* hearing is required; it only states that a relator must be provided "with an opportunity for a hearing" prior to

---

[10] In this regard, the court notes that it examined the "evidence" Relator filed in support of his motions for partial summary judgment – which motions this court deemed premature – and nothing therein changes the court's analysis.

dismissal, which the court has done.  Moreover, the cases which have addressed if and when an evidentiary hearing might be necessary in this context have stated that a relator must demonstrate a "substantial and particularized need" for such a hearing and that "such hearings should not pose a significant burden for the government or court." *Wickliffe*, 473 Fed.Appx. at 584 (quoting marks omitted); *see also Ridenour*, 397 F.3d at 935; *cf. United States ex rel. Stephanie Schweizer v. Oce North America, Inc.*, 956 F.Supp.2d 1, 9 (D.D.C. 2013) ("[A]llowing full-blown discovery as of right would risk transforming the § 3730(c)(2)(B) hearing into a trial on the merits of plaintiff's claims and the government's estimations of the litigation risks.  It would put the cart before the horse, in essence making trial a precondition of settlement.").  Thus, even assuming that an evidentiary hearing may be required in some circumstances, the court does not believe, for the reasons discussed above, that Relator has made a sufficient showing for such a hearing.

Accordingly, the court will recommend that the Government's motion to dismiss pursuant to section 3730(c)(2)(A) be granted.

C.  Remaining Arguments for Dismissal

Because the court concludes that dismissal is appropriate on the two grounds discussed above, it does not believe that it is necessary to consider Defendants' remaining arguments for dismissal.  However, in the interest of completeness, the court will briefly address those arguments as well.  In short, the court is not convinced that dismissal on these other grounds would be appropriate.

1.  Public Disclosure Bar

Defendants argue that the court lacks subject matter jurisdiction over this action pursuant to the "public disclosure bar."  Under 31 U.S.C. § 3730(e)(4)(A),

> [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

An "original source" is defined under section 3730(e)(4)(B) as

> an individual who either (i) prior to a public disclosure under section (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a clam are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).  The public disclosure bar "is designed to foreclose qui tam actions in which a relator, instead of plowing new ground, attempts to free-ride by merely repastinating previously disclosed badges of fraud."  *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 53 (1st Cir. 2009).  "To draw an analogy from the world on entomology, the bar seeks to prevent 'parasitic' suits."  *Id.*

Defendants assert that the key information upon which Relator relies in making his allegations was publicly disclosed, either through Freedom of Information Act responses or other public documents, and that Relator is not the "original source" of such information.  The court, however, agrees with Relator that the alleged fraud was not publicly disclosed -- with one exception -- because the documents to which Defendants point do not "reveal both the misrepresented state of facts and the true

state of facts so that the inference of fraud may be drawn." *Id.* at 54.  For example, it cannot be inferred from the allegedly backdated applications that the dates listed therein are not correct.  Rather, it is Relator's alleged personal knowledge (he is a neighbor of the Farm Defendants) – or, perhaps more accurately, speculation – that forms the basis of his fraud allegations.  The one exception relates to "Fraud Scheme No. 9," wherein Relator alleges that the Farm Defendants submitted forms stating that their land values were $11,600 per acre, even though "[t]he actual value per acre, based on Town of Deerfield Assessor record, is less than $3,000 an acre."  (Compl. ¶ 33.)  Because both the allegedly misrepresented state of facts and, at least according to Relator, the true state of facts were publicly disclosed, the court concludes that this allegation of fraud would be barred pursuant to section 3730(e)(4)(A).  *See Ondis*, 587 F.3d at 54 ("The two states of facts may come from different sources, as long as the disclosures together lead to a plausible inference of fraud.").

    2. <u>Rule 9(b) Particularity Standard</u>

    The Savage Defendants and the USDA Defendants also argue that the action should be dismissed because Relator failed to allege fraud with sufficient particularity under Fed.R.Civ.P. 9(b).  That rule, which applies to Relator's claims here, *see United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009), requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  As the First Circuit explained, "[t]his standard means that a complaint must specify the time, place, and content of an alleged false representation. . . .  The rule may be satisfied, however, where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the

FCA." *Id.* (citations and quotation marks omitted).  In the court's view, Relator's Second Amended Complaint, read as a whole, sufficiently alleges the circumstances constituting fraud so as to satisfy Rule 9(b).

    3. <u>Violation of the Seal</u>

The Savage Defendants and the USDA Defendants next argue that Relator violated the court's seal order by publishing an article which disclosed information about this case.  They contend that, under *United States ex rel. Summers v. LHC Group Inc.*, 623 F.3d 287, 296 (6th Cir. 2010), the appropriate sanction for such a violation is dismissal.  The court is not persuaded.

While *Summers* indeed holds, as a *per se* rule, that "violations of the procedural requirements imposed on *qui tam* plaintiffs under the False Claims Act preclude such plaintiffs from asserting *qui tam* status," *id.*, the court believes that the more appropriate standard is the one adopted by the Ninth Circuit in *United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 424 (9th Cir. 1995).  Under that approach, a district court must balance (1) the extent of any harm to the Government caused by a violation, (2) "the nature" and "relative severity of the violation," and (3) "the presence or absence of bad faith or wilfulness."  *Id.* at 246.  Here, balancing those factors, the court finds that (a) there has been no showing that the Government has been harmed in any way, (b) the violation was relatively minor because the article did not specifically mention this lawsuit or the Farm Defendants, and (c) Relator likely did not act in bad faith in light of the fact that he apparently informed the U.S. Attorney's Office prior to publication.  In the end, the court does not believe that Relator's violation impeded the Government's investigation of his allegations.  *See Summers*, 623 F.3d at 292 ("[T]he primary

purposed of the under-seal requirement is to permit the Government sufficient time in which it may ascertain the status quo and come to a decision as to whether it will intervene in the case filed by the relator.")

4. Sovereign Immunity

Lastly, the USDA Defendants argue that sovereign immunity bars this action because they have been sued in their official capacities and, to the extent Relator wishes to assert individual capacity liability, he may not do so because the Department of Justice has already determined that they were acting within the scope of their employment.  Again, the court is not persuaded.  First, all the cases cited by the USDA Defendants in support of their sovereign immunity assertion concern Eleventh Amendment state sovereign immunity.  The USDA Defendants, however, are federal, not state, employees.  Second, Relator specifically indicated in his complaint that the USDA Defendants are "being sued in [their] individual capacit[ies]" (Compl. ¶¶ 9-14), and the court is not convinced that the Department of Justice's internal determination regarding the scope of their employment somehow binds this court.  Accordingly, in the absence of an adequate assertion of *federal* sovereign immunity and in light of Relator's allegation of individual-capacity liability, the court cannot conclude at this time that sovereign immunity bars these claims.

III.  CONCLUSION

For the reasons stated, the court recommends that Defendants' and the Government's motions to dismiss be ALLOWED.[11]

_____

[11] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the

DATED: March 7, 2014

/s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co*., 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.